**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

---

Joe Brasfield, Kedric Allen, Brady Bell,
Matthew Blackwell, David Davis, Robert Hadley, Jr.,
Jody Kreyer, Michael Mallett, Edward Monroe,
Ronald Monroe, Fabian Moore, Donny Odom
Robert Simmons, Todd Weber, Brandon White
and Timothy Williams, on behalf of themselves
and all other similarly situated employees,

        Plaintiffs,

v.

Source Broadband Services, LLC, and
C-COR, Inc.,

        Defendants.

File No.: 2:08-cv-02092-JPM/dkv

**ORAL HEARING REQUESTED**

---

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PARTIAL
SUMMARY JUDGMENT AND EQUITABLE TOLLING**

---

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 2

    A.    The Parties. ...................................................................................... 2

    B.    C-COR's Unlawful Piece Rate Plan. ............................................... 3

        1.    Development of the C-COR Plan. .......................................... 3

        2.    The C-COR Plan. ................................................................... 5

        3.    John Cato Warns the C-COR Management Team ..................... 6

        4.    C-COR Begins Work On a New Illegal Scheme ..................... 7

        5.    C-COR Recognizes the Risks of Non-Compliance and the Need for Change ................................................................... 8

        6.    Potential Buyers Question the Validity of C-COR's Overtime Practices ... 9

    C.    Source Broadband's Unlawful Piece Rate Plan. ............................. 9

        1.    The Source Broadband Plan ................................................. 10

LEGAL ARGUMENT ....................................................................................... 11

I.    THE C-COR AND SOURCE BROADBAND PIECE RATE PLANS VIOLATE THE FAIR LABOR STANDARDS ACT

    A.    Overtime Under the FLSA, and the Proper Method of Calculating Overtime for Workers Paid by Piece Rate ................................ 12

    B.    C-COR's Piece Rate Plan Violated the FLSA. ............................. 13

    C.    Source Broadband's Piece Rate Plan Violated the FLSA. ............ 15

II.    C-COR AND SOURCE BROADBAND WILLFULY VIOLATED THE FAIR LABOR STANDARDS ACT, AND CANNOT SHOW GOOD FAITH

    A.    The Standards for Willfulness and Liquidated Damages. ............. 17

        1.    Willfulness ........................................................................... 17

        2.    Liquidated Damages. ........................................................... 17

B.   C-COR Willfully Violated the FLSA and Cannot Meet Its Burden of Proving Good Faith. ................................................................................................ 18

C.   Source Broadband Willfully Violated the FLSA and Cannot Meet Its Burden of Proving Good Faith. ........................................................................................ 22

III.  THE COURT SHOULD EQUITABLY TOLL THE STATUTE OF LIMITATIONS FOR FUTURE OPT-IN PLAINTIFFS .................................................................................... 24

CONCLUSION ......................................................................................................................... 27

## <u>TABLE OF AUTHORITIES</u>

**CASES**

Adams v. Inter-Con Sec.Sys., Inc.,
242 F.R.D. 530 (N.D. Cal. 2007) ...............................................................................26

Allen v. Yukins,
66 F.3d 396 (6th Cir. 2004) .......................................................................................25

Alvarez v. IBP, Inc.,
339 F.3d 894 (9th Cir. 2003) .....................................................................................23

Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.,
515 F.3d 1150 (11th Cir. 2008) .................................................................................17

Avit v. Metropolitan Club,
49 F.3d 1219 (7th Cir. 1995) ............................................................................... 17-18

Baden-Winterwood v. Life Time Fitness,
484 F. Supp. 2d 822 (S.D. Ohio 2007) .....................................................................25

Bankston v. Illinois,
60 F.3d 1249 (7th Cir. 1995) .....................................................................................19

Camp v. Progressive Corp.,
2004 WL 2149079 (E.D. La. Sept. 23, 2004) ...........................................................26

Chao v. Barbeque Ventures, LLC,
547 F.3d 938 (8th Cir. 2008) ...............................................................................18, 22

Cox v. Poughkeepsie,
209 F. Supp. 2d 319 (S.D.N.Y. 2002) .......................................................................19

Dole v. Univ. Hosp. Home Care Servs.,
276 F.3d 832 (6th Cir. 2002) .....................................................................................12

Dole v. Elliot Travel & Tours, Inc.,
942 F.2d 962 (6th Cir. 1991) ...........................................................................17, 18, 23

Elwell v. Univ. Hosp. Home Care Servs.,
276 F.3d 832 (6th Cir. 2002) .....................................................................................18

Heidtman v. County of El Paso,
171 F.3d 1038 (5th Cir. 1999) ...................................................................................20

Herman v. Palo Group Foster Home, Inc.,
183 F.3d 468 (6th Cir. 1999) .................................................................18

Herman v. RSR Sec. Servs. Ltd.,
172 F.3d 132 (2nd Cir. 1999) ................................................................22

Hoffmann-La Roche, Inc. v. Sperling,
493 U.S. 165 (1989) ...............................................................................25

Martin v. Ind. Mich. Power Co.,
381 F.3d 574 (6th Cir. 2004) ......................................................17, 18, 21

McClanahan v. Mathews,
440 F.2d 320 (6th Cir. 1971) .................................................................18

McLaughlin v. Richland Shoe Co.,
486 U.S. 128 (1988)................................................................................17

Owens v. Bethlehem Mines Corp.,
630 F. Supp. 309 (S.D. W. Va. 1986) ....................................................26

Redman v. U.S. W. Bus. Res., Inc.,
153 F.3d 691 (8th Cir. 1998) .................................................................25

Walling v. Youngerman-Reynolds Hardwood Co.,
325 U.S. 419 (1945)................................................................................13

## FEDERAL RULES, STATUTES, AND REGULATIONS

Fed. R. Civ. P. 56..................................................................................12

29 U.S.C. § 207(a) .................................................................................13

29 C.F.R. § 778.111(a) ......................................................................13-14

29 C.F.R. § 778.318(c) ...........................................................................14

29 C.F.R. § 778.310 ..........................................................................14, 15

29 C.F.R. § 778.418 ................................................................................14

29 C.F.R. § 778, Subpart F ....................................................................15

29 C.F.R. § 778.502 ..........................................................................15, 16

29 C.F.R. § 778.503 ................................................................................16

29 U.S.C. § 255(a) ......................................................................................................16

29 U.S.C. § 216(b) ......................................................................................................17

29 U.S.C. § 256(b) ......................................................................................................25

## <u>INTRODUCTION</u>

Defendants C-COR and Source Broadband designed and implemented two separate piece rate pay schemes to avoid their obligations to pay overtime.  The first, created by C-COR, justified non-payment of overtime by claiming that overtime was automatically "built-in" to the piece rates.  In other words, C-COR claims that Plaintiffs were paid at an overtime rate for *every* hour they worked, making an additional payment overtime payment unnecessary.  Such schemes, fictitiously attempting to include overtime as a portion of the regular wages, have been specifically rejected by the Department of Labor.

The second scheme was put in place by Source Broadband after it purchased C-COR's installation business in mid-2007.  Despite its knowledge of the proper way to calculate and pay overtime under the DOL regulations, Source Broadband chose another route.  The Source Broadband scheme allocated 20% of an employee's total weekly piece rate earnings as a potential "efficiency bonus."  But it wasn't a bonus at all.  For each hour the employee worked over forty, the portion of the 20% given as the "bonus" decreased, and the remainder was paid as purported "overtime."  Each week, however, the employee received no more than their total earnings from piece rates.  No actual overtime was paid.  Like the C-COR scheme, this type of plan has also been deemed illegal by the Department of Labor.

Armed with the admissions of Defendants' employees and documents confirming their reckless behavior, Plaintiffs now move for summary judgment and ask the Court to rule that these two pay schemes are illegal as a matter of law, that Defendants' actions constitute willful violations the FLSA, and that Plaintiffs are entitled to liquidated damages.  Also, in light of the delays that have prevented individuals from timely opting into this lawsuit, Plaintiffs ask that the Court toll the statute of limitations for Plaintiffs who join this case in the future.

## FACTUAL BACKGROUND

**A.**      **The Parties.**

The Defendants in this lawsuit are Source Broadband Services, L.L.C. ("Source Broadband") and C-COR, Inc. ("C-COR").  (Dkt. 1 (Compl.) ¶¶ 3-7.)  Source Broadband provides installation, maintenance, and technical services for the residential and commercial customers of digital network operators such as Time Warner Cable and Comcast.  (See generally http://www.sourcebroadband.com (last visited April 8, 2009).)  The company was founded by its CEO David Levitan, who was formerly President of one of C-COR's subsidiaries.  (Ex. 1 (Levitan Dep.) at 8:12-15, 74:16-76:25, 78:20-21.)[1]  Source Broadband began operations around June 2007 when Mr. Levitan left his job at C-COR and arranged for the purchase of C-COR's installation services business.  (See id. at 74:16-76:25.)

The Plaintiffs in this case are current and former employees of C-COR and/or Source Broadband who worked as cable installers (sometimes also referred to as "technicians") during the timeframe relevant to this case.  (Dkt. 1 ¶¶ 3-7.)  Plaintiffs' general job duties consisted of installing, repairing, and servicing telephone, Internet and cable equipment for customers of digital network operators.  (See Dkt. 31-2 at 5.)

As installers for C-COR and Source Broadband, Plaintiffs were paid on a "piece rate" basis.  Rather than receiving an hourly wage, Plaintiffs were paid a pre-set amount for each type of installation, service, or other job (i.e., "piece") that they performed during the day.  Plaintiffs recorded the jobs that they performed on daily "pay sheets," which were turned in to their employer.  (See, e.g., Ex. 7 (CCOR 00882-901); Ex. 8 (SBS00186-196).)  The amounts recorded

---

[1]      All cited depositions transcripts are attached as exhibits to the Affidavit of Paul J. Lukas, filed herewith.

on these pay sheets were used to calculate Plaintiffs' earnings for each pay period.  (E.g., Ex. 2 (Ketchum Dep.) at 13:23-14:7; Ex. 9 (NKA000062-64); Ex. 10 (SBS00013, 01065-67).)

Although both C-COR and Source Broadband claimed to pay overtime under their respective piece rate plans, this was far from true.  As explained in more detail herein, despite full knowledge of the Fair Labor Standards Act and its overtime requirements, C-COR and Source Broadband devised and maintained pay schemes that fell woefully short of compliance with the Act.  For years, these plans allowed Defendants to avoid paying hundreds of thousands of dollars in overtime compensation.

**B.**     **C-COR's Unlawful Piece Rate Plan.**

C-COR's piece rate plan avoided the FLSA's overtime requirements by paying piece rates that purportedly had overtime "built-in."  In truth, installers were paid only their earnings from piece rates each week, and were never paid for overtime.

**1.**     **Development of the C-COR Plan.**

The premise behind the C-COR piece rate plan was developed by Jim Romese while working for C-COR's predecessor company, Worldbridge Broadband Services ("Worldbridge").  Mr. Romese started with Worldbridge in 1996, and eventually became Vice President of Operations for Recurring Services.  (Ex. 3 (Romese Dep.) at 8:14-9:6, 12:23-13:2.)  He remained at Worldbridge when it was purchased by C-COR in 2000, and stayed on when Source Broadband bought C-COR's installation business in June 2007.[2]  (Id. at 8:14-9:6, 29:14-17.)

In creating his overtime scheme at Worldbridge, Mr. Romese guessed that a typical week for a cable installer might consist of forty-eight hours, or eight hours of overtime.  (Id. at 16:8-

---

[2]     C-COR acquired Worldbridge and continued to operate under the Worldbridge name until the spring of 2005.  (Levitan Dep. at 8:18-23.)

25.)  To cover any overtime that the installers might work, he claims he added 20% to the company's base piece rates.  (Id. at 16:8-25, 21:14-21, 86:18-87:12.)

Although Mr. Romese testified that his system was based, in part, on a 1998 investigation by the Department of Labor into a Worldbridge facility in Knoxville, Tennessee, he admits that he did not read the DOL reports from the investigation, or discuss his newly-developed "built-in" overtime scheme with the DOL.[3]  (Id. at 84:6-85:20, 88:21-25, 94:15-19.)  The DOL commenced the Knoxville investigation when an employee alleged that installers at the facility were paid overtime only up to forty-eight hours per week, even though they regularly worked more.  (Ex. 12 (CCOR 002878-2884).)  The DOL found no violations because interviews of the employees revealed that most employees in Knoxville did not work over forty-eight hours per week.  (Id. at 002881.)

According to Mr. Romese, he got his forty-eight hour workweek estimate based on one of the DOL's reports from the Knoxville investigation.  (Romese Dep. at 92:6-20.)  He testified that he thought this number was a "good average."  (Id. at 92:18-20.)  Since no violations of the FLSA were found during the Knoxville investigation, Mr. Romese assumed that the company was in compliance.  (Id. at 93:14-23.)

But Mr. Romese admits that he never actually saw the reports of the DOL's findings from the Knoxville investigation.  (Id. at 94:15-19.)  Indeed, the reports from the investigation contain no indication that the DOL ever approved, or even considered, a method of "building in"

---

[3]       The Knoxville location had also been investigated by the Department of Labor in 1996. (Ex. 11 (CCOR 002885-2886, 002895-2896).)   In that investigation, the DOL discovered "substantial overtime violations at the firm because of the practice of paying cable installers by the job" and also found that "[r]ecordkeeping violations had occurred because of the practice of the company . . . keeping no records of hours on the employees."  (Id. at 002895-96.)  As a result of the investigation, Worldbridge agreed that employees would be paid overtime in the future for all hours worked over forty per week.  (Id. at CCOR 002896.)

overtime as later created by Mr. Romese.[4]   (See Ex. 12.)   Moreover, Mr. Romese had no communications with the DOL regarding the investigation.  (Romese Dep. at 88:21-25.)  Nor did he ever seek approval from the DOL regarding his method of "built-in" overtime.[5]  (Id. at 89:1-2.)

Jim Romese's "built-in" overtime system continued after Worldbridge was purchased by C-COR.   (See id. at 22:3-11.)   Mr. Romese never asked for clearance from anyone in management at C-COR regarding the use of the system.  (Id. at 32:6-12.)  Nor did he or anyone at C-COR seek legal advice on whether the system was valid.  (Id. at 32:13-25, 54:18-55:2.)

### 2.        The C-COR Plan.

Using the system Mr. Romese developed at Worldbridge, C-COR claimed to have two rates for each type of job installers performed: (1) the regular rate; and (2) a rate with overtime purportedly "built-in."   (See Ex. 14 (CCOR 002731-732); Ex. 4 (Gardner Dep.) at 58:16-22; Romese Dep. at 60:6-13; Ex. 5 (Cato Dep.) at 18:16-22.)   Although installers at C-COR had varying schedules—working as many as six days per week with varying hours each day—they were always paid at the "overtime" piece rate.   (See Cato Dep. at 34:24-35:4, 46:13-47:4; Gardner Dep. at 58:18-59:18, 61:3-6, 64:16-65:12; Levitan Dep. at 24:10-22, 25:15-26:2, 50:20-

---

[4]        David Levitan testified that he was told by Jim Romese that the DOL had investigated the piece rates plan in Knoxville, and that the plan had been "validated."  (Levitan Dep. at 44:10-18, 49:21-50:6.)

[5]        Mr. Romese also claims that he verified his "built-in" overtime system using DOL Form WH-134, which he says he found on the Internet.  (Romese Dep. at 22:19-23:15.)  He admits, though, that he did not actually follow the form's instructions.  (Id. at 82:6-83:2.)    Not surprisingly, Form WH-134 says nothing about "building in" overtime to piece rates based on estimated hours worked.  (See Ex. 13 (Form WH-134).)  To the contrary, it contains specific instructions on how overtime should be calculated and paid on a weekly basis for varying amounts of overtime.  (See id.)

24.)  This was true regardless of whether they worked more than forty hours in a workweek, or fewer.  (Gardner Dep. at 58:23-59:18; Cato Dep. at 46:13-47:4.)

Because the rates supposedly had overtime included, installers were paid only their total earnings from piece rates each week, and no separate payment for overtime.  (See Gardner Dep. at 68:7-10; Levitan Dep. at 69:3-14; Cato Dep. at 78:18-79:4.)  As former Project Manager Mark Gardner explained, a C-COR installer who performed ten tasks in one week would be paid the same amount of money, regardless of whether he worked thirty hours that week, or fifty.  (Gardner Dep. at 59:23-60:7; accord Cato Dep. at 19:19-20:2 (admitting that the C-COR piece rate was not tied to hours worked).)

### 3.     John Cato Warns the C-COR Management Team.

In the spring of 2006, the C-COR management team decided to revise the current piece rate system, and started talking about the issue at its monthly operations meetings.[6]  (Cato Dep. at 20:3-8, 21:20-22:5.)  During the revision process, Director of Human Resources John Cato reviewed the DOL regulations relating to piece rate compensation.  (Id. at 15:8-13, 25:16-26:1.)  On February 1, 2006, in advance of the monthly meeting, Mr. Cato sent an e-mail to the team expressing concern that C-COR was not calculating overtime properly.[7]  (Ex. 15 (CCOR 002798).)  He wrote:

---

[6]     The team working on the compensation project included David Levitan, Jim Romese, Keith Oldham, Scott Ishler, Keith Kreager, Chirag Trivedi, and Gary Hahn.  (Cato Dep. at 20:3-13.)

[7]     Mr. Cato knew that C-COR's "built-in" overtime system was not the method of calculation described in his e-mail.  (Cato Dep. at 28:23-29:4.)  Indeed, he had seen nothing in his review of the DOL regulations that validated C-COR's current practice paying overtime.  (Id. at 29:23-30:24.)  Despite this fact, like Mr. Romese before him, Mr. Cato never consulted with the DOL, any attorneys, or anyone else outside the company, to determine whether C-COR's pay scheme complied with the FLSA.  (Id. at 50:2-14, 74:11-18.)

Team:

As part of the MOPS Meeting in February, we need to discuss the calculation of overtime for our Piece Rate Employees.  The DOL requires us to calculate overtime as follows:

An employee earns $1000 piece work in a 50 hour work week.  The hourly rate is calculated by taking the total piece rate pay and dividing the hours (**$1000/50= $20 per hour**).  Since the employee worked 10 hours more than the standard 40 hour work week, we must pay the employee ½ time for the additional 10 hours or (**$10*10=$100**).  When you add them together, the employee should earn **$1,100** for this week and that is what is submitted to payroll.

Discussion points:
- Are we tracking hours?  If not, we need to come up with the appropriate method of doing so.
- How do we make sure the additional wages do not negatively impact our margins?
- We will need a separate sheet for California, as overtime is calculated at any hours over 8 in that state.
- Implementation Schedule should be immediate, which means we need to get on the same pay weeks on all projects.

Please be ready to discuss at our meeting.

(Id. (emphasis in original).)

### 4.    C-COR Begins Work On a New Illegal Scheme.

Despite Mr. Cato's warning, the C-COR piece rate plan remained in place.  In fact, instead of trying to fix the current system, the C-COR team began work on another scheme to *avoid* paying overtime.  A similar scheme would eventually be used at Source Broadband.

On March 13, 2006, President David Levitan sent an e-mail to Mr. Romese and Mr. Cato about a new way to pay installers using a form of "production bonus."  Mr. Levitan explained that under the new system, "[t]otal compensation [would be] the same for work completed, with the split between hourly, overtime and production bonuses adjusting as necessary."  (Ex. 16 (CCOR 002788-2791) (emphasis added).)

Later, on August 7, 2006, Mr. Levitan sent an update on the new system explaining, "If we have structured the comp scheme properly, neither they nor we should see any negative impact with the change."  (Ex. 17 (CCOR 002781-2872).)  He explained that under the new scheme, "[a]s hours go up for the same amount of work, the productivity bonus and average hourly wage decline."  (Id.)

**5.      C-COR Recognizes the Risks of Non-Compliance and the Need for Change.**

By late August 2006, C-COR still had not discontinued the practice of illegally "building in" overtime to its piece rates.  By then, the company had finally acknowledged the potentially severe consequences of its continued violation of the FLSA, and the need for immediate compliance.

On August 29, 2006, a presentation was given at C-COR entitled, "Position and Compensation Proposal for Installation Technicians."  (Ex. 18 (CCOR 002805-2813).)  The first page of the presentation included the following analysis:

# Why Change?

- Development
  - Allow for a career path for our technicians.
  - Reward our more skilled and experienced technicians for mentoring and training our new technicians.
  - Create a transition team to assist in the start up of new projects.

- Compliance
  - According to DOL regulations, all piece rate employees are eligible for O/T pay for hours over 40 per week in 49 states.
  - Increasing pressure from Unions and postings on multiple sources warning employers of the proper pay standards.
  - Large fines paid by current and former competitors due to non-compliance.

(Id. at 002806.)  The presentation also laid out the mechanics of Mr. Levitan's new "production bonus" scheme—now referred to as an "efficiency incentive"—as a potential new method of paying installers.   (Id. at 002807.)

> **6.     Potential Buyers Question the Validity of C-COR's Overtime Practices.**

In the spring of 2007, C-COR was in the process of selling its cable installation business, and still had not changed its practice of unlawfully "building in" overtime into its installers' piece rates.  Potential bidders raised C-COR's lack of compliance with the FLSA as a point of concern during the due diligence process.

For example, on April 5, 2007, Director of Human Resources Dean Hilderhoff received an e-mail indicating that a bidder needed to see a "[d]escription of how we comply with FLSA requirements regarding overtime."  (Ex. 19 (CCOR 002791-92).)  He was told that "this has been raised as an area of concern by the one bidder on a call last week."  (Id.)

Another e-mail, dated May 2, 2007, contains an account of a meeting in which a bidder directly challenged C-COR's overtime payment practices.  The e-mail reads:

> Today, they were very challenging and probing in their questions.  We spent 30 minutes on the first project.  A consistent theme was that we must be doing something wrong with FLSA in order to generate the revenues per installer that were in the pitch.  They really are concerned about this.

(Ex. 20 (CCOR 003104-3107).)

Despite these warnings, the C-COR plan remained in place until the company's installation business was purchased by Source Broadband.

## C.     Source Broadband's Unlawful Piece Rate Plan.

When Source Broadband began operations in June 2007, the company settled on a new piece rate plan, based largely on the scheme that Mr. Levitan had started developing while at C-COR.  (See Levitan Dep. at 41:22-42:1.)  Although the new plan gave the illusion that separate

payments were being made to installers for overtime, they were not.[8]   This was accomplished through the so-called "efficiency premium."

### 1.   The Source Broadband Plan.

Like at C-COR, installers at Source Broadband were paid a sum equal to their total weekly earnings from piece rates, regardless of the number of hours they worked.  (See Ex. 6 (Hilderhoff Dep.) at 56:3-21.)  The Source Broadband plan, however, broke down an installer's earnings into several components.  (E.g., Ex. 21 (SBS00013).)  Each week, 80% of an installer's total piece rate earnings was labeled as the "base" piece rate.  (See Hilderhoff Dep. at 27:2-25, 33:13-17.)  The remaining 20% was allocated as either (1) an efficiency premium, or (2) "overtime" pay, depending on the number of hours worked in the week.  (See Hilderhoff Dep. at 27:2-25, 33:19-34:11; Ketchum Dep. at 44:6-11.)

The allocation of the 20% between "efficiency premium" and "overtime" pay was done through an elaborate process developed by Source Broadband.[9]  For every hour (or fraction of an hour) that an installer worked over forty in a given week, his efficiency premium decreased by a

---

[8]     On July 17, 2007, Dean Hilderhoff e-mailed a demonstration of how the new plan was "[m]ostly the same as before [under C-COR]."  (Ex. 22 (SB00351-352).)  The e-mail explained that an installer earning $1,500 for forty-five hours of work at C-COR would receive the exact same amount at Source Broadband.  (Id.)  At Source Broadband, however, the $1,500 would be broken down into "piecerate," "premium," and "overtime."  (Id.)

[9]     Dean Hilderhoff explained the process as follows.  First, the base piece rate and potential efficiency premium are calculated.  To do this, total weekly earnings from piece rates are multiplied by 80% to get the base piece rate, and by 20% to get the potential efficiency premium. (Hilderhoff Dep. at 33:13-21.)  Second, the amount of the potential efficiency premium actually "earned" is calculated.  Here, depending on the number of hours worked over forty, the potential efficiency premium (20%) is multiplied by a set percentage derived from a table developed by Source Broadband.  (Hilderhoff Dep. at 33:23-34:11; Ex. 23.)  Third, the amount paid as purported "overtime" is calculated.  The earned efficiency premium is added to the base piece rate (80%), and the sum is divided by the total number of hours worked.  (Hilderhoff Dep. at 35:6-8, 36:11-16.)  The resulting number is divided by two, and multiplied by the number of overtime hours worked.  (Hilderhoff Dep. at 37:3-20.)

set percentage according to Source Broadband's "Efficiency Premium Calculation" table, and his overtime pay increased by an inversely proportional amount. (<u>See</u> Ketchum Dep. at 44:6-20; Ex. 23 (efficiency premium calc. table).)    As Source Broadband project administrator Lydia Ketchum put it, "The more efficient they work, the more they make as efficiency. The longer it takes, that actually becomes overtime." (Ketchum Dep. at 44:9-11.)

To illustrate, attached as Exhibit 24 is a demonstrative of how the Source Broadband piece rate plan works in practice. The demonstrative depicts the gross wages of a hypothetical installer who earns $1,000 in piece rates each week over the course of five weeks, and whose hours worked increase from forty in the first week, to eighty in the fifth week. The installer's gross wages are calculated for each week using the method explained by Director of Human Resources Dean Hilderhoff, and Source Broadband's Efficiency Premium Calculation table. (<u>See</u> Hilderhoff Dep. at 33:2-37:3; Ex. 23.)

Under the Source Broadband piece rate plan, the hypothetical installer's gross wages each week equal no more (within a dollar) than his total earnings from piece rates, regardless of the number of overtime hours he works. (Ex. 24.) The only difference is that as his overtime hours increase, his "efficiency premium" decreases, and his "overtime" pay increases by an inversely proportional amount. (<u>Id.</u>)

## **LEGAL ARGUMENT**

The Fair Labor Standards Act mandates that covered employers pay their workers overtime, at a rate of one and one-half times the regular rate, for all hours worked over forty in any workweek. C-COR and Source Broadband knowingly, and purposefully, violated the FLSA by creating and maintaining piece rate schemes that did not properly pay overtime.

Accordingly, Plaintiffs move for summary judgment[10] on their claims (1) that Defendants' piece rate plans violate the FLSA, (2) that Defendants willfully violated the FLSA, and (3) that Plaintiffs are entitled to liquidated damages.  Also, in light of the fact that many installers have been prevented from opting in to this lawsuit because of delays in the issuance of notice, Plaintiffs ask the Court to equitably toll the statute of limitations for individuals who opt-in to this case in the future.

## I.   THE C-COR AND SOURCE BROADBAND PIECE RATE PLANS VIOLATE THE FAIR LABOR STANDARDS ACT.

The C-COR and Source Broadband piece rate plans both fail to pay proper overtime as required by the Fair Labor Standards Act.  Defendants are not the first employers to use clever piece rate schemes in an attempt to avoid the payment of overtime compensation.  Indeed, both plans use methods that have been specifically addressed in the Depart of Labor's regulations, and rejected as illegal.  Summary judgment is warranted.

### A.   Overtime Under the FLSA, and the Proper Method of Calculating Overtime for Workers Paid by Piece Rate.

Under Section 7(a) of the FLSA, employers must pay overtime to employees for all hours worked per week over forty at a rate not less than one and one-half times their "regular rate."  29 U.S.C. § 207(a).  The rationale for this is two-fold.  First, because the employer's labor costs are increased after a forty-hour work week, the employer is induced to reduce the required hours of work, and to hire more employees.  Walling v. Youngerman-Reynolds Hardwood Co., 325 U.S.

---

[10]   Summary judgment should be granted when there is no dispute as to any material fact, and one party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Viewing all facts and inferences in the light most favorable to the non-moving party, the court determines whether a reasonable jury could find in that party's favor.  Dole v. Univ. Hosp. Home Care Servs., 276 F.3d 832, 837 (6th Cir. 2002).

419, 423-424 (1945).   Second, overtime compensates employees for the burden of a long workweek by giving them a premium for the excess hours worked.  Id.

To pay proper overtime under the FLSA, employers must do more than merely label a portion of the wages each week as "overtime."  Overtime must be determined each week, as the Act requires, at a rate no less than one and one-half times the "regular rate."  29 U.S.C. § 207(a).  For employees paid by piece rate, the regular rate is computed by adding together the employee's total weekly earnings from piece rates and all other sources, and dividing that sum by the number of hours in the week for which the compensation was paid.  29 C.F.R. § 778.111(a).

If the employer and employee agree that the piece rates are intended as compensation for all hours worked, then the employer may pay overtime at one-half the regular rate.  See 29 C.F.R. § 778.111(a) ("Only half-time pay is required in such cases where the employee has already received straight-time compensation at piece rates . . . for all hours worked."); 29 C.F.R. § 778.318(c).  In the absence of such an agreement, then overtime must be paid at the standard one and one-half times the regular rate.  29 C.F.R. § 778.111(a); 29 C.F.R. § 778.318(c).

### B.       C-COR's Piece Rate Plan Violated the FLSA.

C-COR's practice of "building in" overtime to piece rates is not a proper method of calculating overtime under the FLSA, and plainly violates both the letter and the spirit of the Act.  In particular, this type of scheme disregards the imperative that an additional overtime premium is to be paid for all hours worked over forty.[11]  See 29 C.F.R. § 778.111(a) (noting that overtime is to be paid "in addition" to total weekly earnings at the regular rate).

_____

[11]       Although the FLSA and its regulations provide an exemption whereby piece workers may be paid for work done during overtime hours at a rate not less than one and one-half times the rate they receive during nonovertime hours, this provision does not apply here.  See 29 C.F.R. § 778.418.  The exception requires, among other things, that the non-overtime piece rate be a "bona fide" rate.  This means that it is "the rate actually paid for work during the nonovertime

Under the DOL regulations, "[a] premium in the form of a lump sum which is paid for work performed during overtime hours without regard to the number of overtime hours worked does not qualify as an overtime premium[.]"  29 C.F.R. § 778.310.  Rather, "where extra compensation is paid in the form of a lump sum for work performed in overtime hours, *it must be included in the regular rate* and may not be credited against statutory overtime compensation due."  Id. (emphasis added).

C-COR did not comply.  Rather than paying an extra overtime premium based on the hourly regular rate as provided by the regulations, C-COR simply paid its installers their total weekly earnings from piece rates—regardless of the number of hours worked—because it claimed the overtime had already been "built-in."[12]  In other words, C-COR purportedly paid overtime in the form of a "lump sum" added onto each piece rate.  This does not pass muster. As the regulations explain:

> If the rule were otherwise, an employer desiring to pay an employee a fixed salary regardless of the number of hours worked . . . could merely label as overtime pay a fixed portion of such salary sufficient to take care of compensation for the maximum number of hours that would be worked.  *The Congressional purpose to effectuate a maximum hours standard by placing a penalty on the performance of excessive overtime work would thus be defeated.*

Id. (emphasis added).

There is no question that C-COR violated the overtime provisions of the FLSA through its use of a piece rate plan with "built-in" overtime.  Summary judgment should be granted.

---

hours."  Id. § 778.418(b).  Here, C-COR admittedly did not actually pay its purported "regular" rate during nonovertime hours.  (See Gardner Dep. at 58:23-59:18; Cato Dep. at 46:13-47:4.)

[12]    There was no set amount of hours worked by installers at C-COR.  (See Cato Dep. at 34:24-35:4; Gardner Dep. at 61:3-6, 64:16-65:12; Levitan Dep. at 24:10-22, 25:15-26:2, 50:20-24.)

C.      **Source Broadband's Piece Rate Plan Violated the FLSA.**

Source Broadband's scheme also violates the FLSA, for only slightly different reasons. Like C-COR, Source Broadband also intentionally ignored the proper method for calculating overtime as provided by the DOL regulations.  And as with the C-COR plan, schemes like the one used by Source Broadband are expressly disallowed by the regulations.

The DOL regulations address various types of illegal schemes designed to avoid paying overtime in the aptly-titled subpart, "Pay Plans Which Circumvent the Act."  See 29 C.F.R. § 778, Subpart F.  One of the schemes discussed is the "pseudo bonus," in which the employer artificially labels part of the regular wage as a bonus.  29 C.F.R. § 778.502.  Although addressed in the context of an hourly employee, the example used in the regulations applies squarely to the case at hand.  The regulations explain:

> For example, if an employer has agreed to pay an employee $300 a week without regard to the number of hours worked, the regular rate of pay of the employee is determined each week by dividing the $300 salary by the number of hours worked in the week.  The situation is not altered if the employer continues to pay the employee, whose applicable maximum hours standard is 40 hours, the same $300 each week but arbitrarily breaks the sum down into wages for the first 40 hours at an hourly rate of $4.80 an hour, overtime compensation at $7.20 per hour and labels the balance a "bonus" (which will vary from week to week, becoming smaller as the hours increase and vanishing entirely in any week in which the employee works 55 hours or more).

Id.

This is what happened here.  The Source Broadband scheme allocated a predetermined sum of 20% of the installers' total weekly piece rate earnings as a purported "bonus."  For each hour worked over forty, the amount paid as the "bonus" decreased, and the amount labeled

15

"overtime" increased by an inversely proportional amount.  Each week, the installers received no more than their total earnings from piece rates.  No actual overtime was paid.[13]

There is no genuine issue of fact as to whether the piece rate plans used by C-COR and Source Broadband fail to calculate and pay proper overtime under the Fair Labor Standards Act. Summary judgment should be granted.

## II.   C-COR AND SOURCE BROADBAND WILLFULY VIOLATED THE FAIR LABOR STANDARDS ACT, AND CANNOT SHOW GOOD FAITH.

On top of the fact that the C-COR and Source Broadband piece rate plans are facially invalid under the Fair Labor Standards Act, there is no doubt that both companies willfully violated the FLSA by implementing and maintaining these schemes.   Moreover, neither Defendant can meet their "substantial" burden of showing that they acted in good faith. Accordingly, the statute of limitations for Plaintiffs' claims should be extended to three years, and Plaintiffs should be awarded liquidated damages.

---

[13]     Another scheme discussed in the regulations is the "pseudo percentage bonus."  29 C.F.R. § 778.503.  This type of scheme is equally relevant here.  The regulations provide:

> Such [pseudo percentage] bonuses . . . are generally separated out of a fixed weekly wage and usually decrease in amount in direct proportion to increases in the number of hours worked in a week in excess of 40.  The hourly rate purportedly paid under such a scheme is artificially low, and the difference between the wages paid and the hourly rate and the fixed weekly compensation is labeled as a percentage of wage "bonus."

Id.  The regulations explain that in this type of plan, the employee in reality is paid no overtime at all.  Id.  The employer pays the same amount per week, no matter how many hours of overtime the employee works.  Id.

A.    **The Standards for Willfulness and Liquidated Damages.**

    1.    **Willfulness.**

Ordinary violations of the Fair Labor Standards Act are subject to a two-year statute of limitations. 29 U.S.C. § 255(a). When a violation is willful, the limitations period is extended to three years. Id. A violation of the FLSA is willful when "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by [the Act.]" McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988); Dole v. Elliot Travel & Tours, Inc., 942 F.2d 962, 967 (6th Cir. 1991). Plaintiffs bear the burden of proving willfulness by a preponderance of the evidence. See Richland Shoe, 486 U.S. at 135; Alvarez Perez v. Sanford-Orlando Kennel Club, Inc., 515 F.3d 1150, 1163 (11th Cir. 2008).

    2.    **Liquidated Damages.**

Section 216(b) of the FLSA provides than an employer who violates the overtime compensation provisions of the Act "shall be liable" for liquidated damages in an amount equal to unpaid back wages. 29 U.S.C. § 216(b). Double damages are the norm under the FLSA, and single is the exception. Martin v. Ind. Mich. Power Co., 381 F.3d 574, 584 (6th Cir. 2004); Avit v. Metropolitan Club, 49 F.3d 1219, 1223 (7th Cir. 1995). The additional damages "are compensation, not a penalty or punishment." Martin, 381 F.3d at 584.

Although courts have some discretion to limit an award of liquidated damages, this discretion may be exercised if—and only if—the employer shows both (1) that it acted in good faith, and (2) that it had reasonable grounds to believe that it was not violating the Act. Id.; Dole v. Elliot Travel & Tours, Inc., 942 F.2d 962, 967 (6th Cir. 1991). The employer's burden to prove good faith and reasonableness is "substantial." McClanahan v. Mathews, 440 F.2d 320, 323 (6th Cir. 1971); Elwell v. Univ. Hosp. Home Care Servs., 276 F.3d 832, 840 (6th Cir. 2002).

If this burden is not carried, the court has no power or discretion to limit or decline to award liquidated damages.  Martin, 381 F.3d at 584; Elwell, 276 F.3d at 840.

"The 'good faith' requirement is a subjective standard where the employer must establish an honest intention to ascertain and follow the dictates of the FLSA."  Chao v. Barbeque Ventures, LLC, 547 F.3d 938, 942 (8th Cir. 2008) (internal quotations omitted).  To prove that it acted in good faith, an employer must show that it "took *affirmative steps* to ascertain the Act's requirements, but nonetheless violated its provisions."  Martin, 381 F.3d at 584 (emphasis added).  Good faith means more than merely "not willfully" failing to comply, and even negligent conduct demonstrates a lack of good faith.  Id.  If the employer can meet its burden to show subjective good faith, it must then show that its reasons for believing there was no violation were objectively reasonable.  See id.; Elliot Travel & Tours, 942 F.2d at 967; Barbeque Ventures, 547 F.3d at 942.

Significantly, the Sixth Circuit has held that a finding of willfulness "forecloses the possibility" of finding that the employer acted reasonably and in good faith.  Elwell, 276 F.3d at 842 n.5; accord Herman v. Palo Group Foster Home, Inc., 183 F.3d 468, 474 (6th Cir. 1999) ("[A] finding of willfulness is dispositive of the liquidated damages issue.").  Therefore, the reasons stated below for why summary judgment on willfulness is appropriate likewise support a finding of summary judgment in Plaintiffs' favor on full liquidated damages.

**B.     C-COR Willfully Violated the FLSA and Cannot Meet Its Burden of Proving Good Faith.**

C-COR's continued use of its piece rate plan with allegedly "built-in" overtime was a willful violation of the FLSA, and completely negates the showing of good faith needed to avoid liquidated damages.  Moreover, the excuses given by C-COR's management team for their non-compliance are objectively unreasonable.

18

At least several courts have granted summary judgment on willfulness where employers continued to violate the FLSA even after being warned of their non-compliance.  See, e.g., Bankston v. Illinois, 60 F.3d 1249, 1255 (7th Cir. 1995) (upholding a finding of willfulness when the defendant received a memorandum from its legal department explaining their responsibilities under the FLSA); Cox v. Poughkeepsie, 209 F. Supp. 2d 319, 328 (S.D.N.Y. 2002) (granting summary judgment where the defendant received a letter from an attorney indicating that he believed employees were not being paid in accordance with the requirements of the FLSA).  This is exactly what happened here.

C-COR knew by at least early 2006 that it was violating the FLSA.  After examining the DOL regulations, John Cato warned the management team on February 1, 2006 that "[t]he DOL *requires* us to calculate overtime as follows[,]" and urged the "immediate" implementation of an FLSA-compliant system.[14]  (Ex. 15 (emphasis added).)  But despite Mr. Cato's warning, nothing changed.  Indeed, the illegal plan remained even after the company finally acknowledged the need for change, and the specific risks associated with non-compliance.  The "Why Change?" presentation of August 29, 2006 confirms C-COR's awareness that "[a]ccording to DOL regulations, all piece rate employees are eligible for O/T pay for hours over 40 per week in 49 states."  (Ex. 18.)  The presentation even points out that that some of C-COR's competitors had been forced to pay "large fines" because of non-compliance with the FLSA's overtime provisions.  (Id.)  Still, no change was made.

Even companies looking into buying C-COR's installation business warned the company that something was wrong.  On April 5, 2007, Dean Hilderhoff was warned that a bidder wanted

---

[14]     Mr. Cato knew that C-COR's "built-in" overtime system was not the method of calculation described in his e-mail.  (Cato Dep. at 28:23-29:4.)  He had seen nothing in his review of the regulations that validated C-COR's current practice paying overtime.  (Cato Dep. at 29:23-30:24.)

to see a "[d]escription of how we comply with FLSA requirements regarding overtime," and was told that the issue had "been raised as an area of concern by the one bidder on a call last week." (Ex. 19.)  Another e-mail, dated May 2, 2007, cautioned that a potential buyer was worried that the C-COR was violating the FLSA:

> Today, they were very challenging and probing in their questions.  We spent 30 minutes on the first project.  _A consistent theme was that we must be doing something wrong with FLSA in order to generate the revenues per installer that were in the pitch.  They really are concerned about this._

(Ex. 20 (emphasis added).)

Even in the face of these glaring warning signs, the C-COR plan remained in place until the installation business was purchased by Source Broadband in June 2007.  There is no question that C-COR knew, or showed reckless disregard for whether its method of paying overtime violated the FLSA.

And as for good faith, the actions described above are a far cry from good faith and reasonableness.  No reasonable employer would ignore such obvious signs of non-compliance. See Heidtman v. County of El Paso, 171 F.3d 1038, 1042 (5th Cir. 1999) ("[E]mployers cannot act in good faith based on reasonable grounds when they suspect that they are out of compliance with the FLSA[.]").  Moreover, the various litigation-inspired excuses given by the C-COR management team for their failures do not demonstrate the type of _affirmative_ care required to show good faith.  Martin, 381 F.3d at 584 (noting that even negligence defeats a showing of good faith).  They show unreasonableness.

For example, although Jim Romese claims he thought his built-in overtime system had been "approved" by the DOL in its investigation of the Knoxville facility, he admits that he

never actually saw the DOL's reports.[15]   (Romese Dep. at 94:15-19.)  He had no contact with the DOL about the investigation, and never sought confirmation from the DOL that his system was correct.  (Romese Dep. at 88:21-25, 89:1-2.)  In fact, Mr. Romese never even asked anyone in management for clearance to use the system after Worldbridge was purchased by C-COR. (Romese Dep. at 32:6-12.)  Nor did he seek separate legal advice on whether the system was valid.  (Romese Dep. at 32:13-25, 54:18-55:2.)  Mr. Romese's actions were not reasonable.

David Levitan's excuse fairs no better.  Mr. Levitan claims he relied on John Cato and other members of the human resourced department for guidance on whether installers were being paid properly.  (Levitan Dep. at 16:20-17:10, 18:1-25.)  According to Mr. Levitan, Mr. Cato had grown "increasingly" knowledgeable about the FLSA as the company started working to change its method of compensation.  (Levitan Dep. at 18:1-6.)  Mr. Cato's own testimony belies this. Mr. Cato testified that he knew about the FLSA regarding hourly workers, but was "not necessarily" knowledgeable as it relates to piece rate workers.  (Cato Dep. at 13:1-14.)  He describes his knowledge of piece rate plans as "limited."  (Cato Dep. at 19:11-18.)  Mr. Levitan's blind faith in Mr. Cato—without even making sure Mr. Cato had the requisite knowledge regarding piece rate compensation—was objectively unreasonable.   See Chao v. Barbeque Ventures, LLC, 547 F.3d 938, 942-43 (8th Cir. 2008) (explaining that an employer may not escape the requirements of the FLSA by delegating to others, but must "stand or fall" with those who act on its behalf).

And even though Mr. Cato's job was to make sure C-COR complied with wage and hour laws, he did little to nothing to fulfill this duty. An employer cannot avoid liquidated damages where they have knowledge of the FLSA, but fail to ensure compliance with the Act.  See

---

[15]   Even if Mr. Romese *had* viewed the reports, they contain no indication that the DOL ever approved such a method.  (See Ex. 12.)

Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 137 (2nd Cir. 1999). (awarding liquidated damages where the employer had knowledge of the FLSA, "but utterly failed to take the steps necessary to ensure [that his] pay practices complied with the Act").  Although Mr. Cato looked into the DOL regulations on piece rates—and even sent an e-mail to the management team about the proper method of calculation—he failed to make sure the right system was actually put in place.  Incredibly, Mr. Cato somehow claims that he had "no reason to believe" that C-COR was not compliant.  (Cato Dep. at 19:11-18, 29:5-13.)  This, of course, is false.

In sum, there is no genuine issue of fact as to whether C-COR knew or showed reckless disregard for whether its practices violated the FLSA, and there is no evidence of good faith. Summary judgment is warranted on both willfulness and liquidated damages.

### C.    **Source Broadband Willfully Violated the FLSA and Cannot Meet Its Burden of Proving Good Faith.**

The same is true for Source Broadband.  Despite full awareness of the fact that C-COR's piece rate plan had been out of compliance, members of the same management team implemented a similar scheme at Source Broadband that was specifically designed to avoid paying overtime.  Source Broadband willfully violated the FLSA, and cannot meet its substantial burden of showing good faith to avoid liquidated damages.

Foremost, the fact that the Source Broadband piece rate plan was designed and implemented by the same group of executive employees who were in charge at C-COR is irrefutable evidence of willfulness.  Employees like David Levitan and Dean Hilderhoff were put on specific notice of the correct way to pay overtime while working at C-COR.  See Dole v. Elliot Travel & Tours, Inc., 942 F.2d 962, 967 (6th Cir. 1991) (upholding a finding of willfulness when the defendant's predecessor company had been found to violate the FLSA).

Willfulness is also established by the fact that Source Broadband designed its new plan specifically to thwart the FLSA's overtime requirements.  See Alvarez v. IBP, Inc., 339 F.3d 894, 909 (9th Cir. 2003) (affirming willfulness where "[the defendant's] actions may more properly be characterized as attempts to evade compliance, or to minimize the actions necessary to achieve compliance.").  Indeed, the illegal motivation behind the Source Broadband plan was already coming to the surface while Mr. Levitan and Mr. Hilderhoff were still working for C-COR.  (See Levitan Dep. at 41:22-42:1 (explaining that "a lot of the mechanics of the system were certainly created and sorted through during the C-COR time.").)

In his e-mail of January 1, 2006, Mr. Cato challenged the C-COR management team to think of ways to "make sure the additional wages do not negatively impact our margins[.]"  (Ex. 15 (emphasis added).)  This is exactly what they did.   As early as March 13, 2006, Mr. Levitan started working on the development of a piece rate scheme in which *"[t]otal compensation is the same for work completed*, with the split between hourly, overtime and production bonuses *adjusting as necessary."*  (Ex. 16 (emphasis added).)  On August 7, 2006, Mr. Levitan sent an e-mail to his team explaining, "If we have structured the comp scheme properly, neither they nor we should see any negative impact with the change."  (Ex. 17.)  He explained that "[a]s hours go up for the same amount of work, the productivity bonus and average hourly wage decline."  (Id.)

In view of Source Broadband's implementation of a plan that was purposefully developed to get around the FLSA's overtime requirements—by the same core team responsible C-COR's unlawful plan—summary judgment is appropriate.  Source Broadband knew, or showed reckless disregard for whether its actions violated the FLSA.

As for evidence of good faith, the pre-meditated conduct described above is just the opposite.  Moreover, the Source Broadband management team took few, if any, meaningful steps

23

to ensure compliance.  For example, although it was Mr. Levitan's decision to implement the Source Broadband piece rate system, he declined to seek legal advice about whether it complied with the FLSA, choosing instead to rely on the work that had already been done at C-COR. (Levitan Dep. at 84:5-13.)  This "work" however, was not an effort to seek out and comply with the relevant laws and regulations.  As explained above, it was an attempt to avoid them.

In sum, there is no genuine issue of material fact as to whether C-COR or Source Broadband willfully violated the FLSA by developing and maintaining piece rate plans designed to avoid paying overtime.  Likewise, neither Defendant can show the requisite good faith and reasonableness required to avoid liquidated damages.  Summary judgment should be granted.

## IV.     THE COURT SHOULD EQUITABLY TOLL THE STATUTE OF LIMITATIONS FOR FUTURE OPT-IN PLAINTIFFS.

Finally, in view of the delays that have prevented many individuals from promptly joining this case, Plaintiffs request that the Court equitably toll the statute of limitations, from at least the date of the filing of Plaintiffs motion for conditional certification, for those who opt-in to this case in the future.  Equitable tolling will accomplish the remedial purpose of the FLSA by giving these individuals the full measure of relief afforded under the Act.

The benefits of an FLSA collective action "depend on employees receiving accurate and timely notice . . . so that they can make informed decisions about whether to participate." Hoffmann-La Roche, Inc. v. Sperling, 493 U.S. 165, 170 (1989).  The opt-in nature of the collective action mechanism necessitates prompt action because the commencement of the lawsuit does not toll the statute of limitations for every putative class members' claim.  See 29 U.S.C. § 256(b); Redman v. U.S. W. Bus. Res., Inc., 153 F.3d 691, 695 (8th Cir. 1998). Accordingly, putative class members' claims continuously diminish or disappear altogether as they await notice of the suit. Redman, 153 F.3d at 695.

24

In certain cases, courts may apply the doctrine of equitable tolling to prevent potential plaintiffs from losing their claims. In the Sixth Circuit, courts look to the following factors to determine whether tolling is appropriate: (1) plaintiffs' lack of notice or constructive notice of the filing requirement; (2) diligence; (3) lack of prejudice to the defendant; and (4) reasonableness of the plaintiffs remaining ignorant of the filing requirement. Allen v. Yukins, 366 F.3d 396, 401 (6th Cir. 2004). Not every factor is relevant in all cases, and courts have the discretion to consider other factors when equity so demands. Baden-Winterwood v. Life Time Fitness, 484 F. Supp. 2d 822, 827 (S.D. Ohio 2007).

The factors militate in favor of tolling in this case. As to notice of the filing requirement, it is doubtful that any of the putative class members will have notice—actual or constructive—of this lawsuit or the filing requirement prior to receiving the notice authorized by this Court. (Dkt. 133.) It is likewise reasonable for them to remain in the dark until Court-authorized notice is finally sent and received.

On the issue of diligence, the named Plaintiffs in this case acted diligently in immediately moving for conditional certification so that other current and former employees would receive notice as soon as possible. Plaintiffs filed their Complaint on February 12, 2008, and filed their motion for conditional certification just over two months later, on April 28, 2008. (Dkt. 1, 31.) Knowing that Plaintiffs brought the motion without the benefit of discovery (as is typical under the FLSA's two-stage certification process), Defendants challenged conditional certification by arguing, for example, that the alleged conduct was not nationwide. (Dkt. 62, 64.) But all the while, Defendants knew full well that the payment plans at issue were used for all installers regardless of geographic location. (See Dkt. 134.) Because of these unnecessary disputes, Plaintiffs' case was not conditionally certified until March 20, 2009. (Dkt. 133.) In sum, the fact

that notice could not be sent until nearly a year later was not Plaintiffs' fault.[16]

Finally, the lack of prejudice to Defendants also weighs in favor of tolling.  "The purpose of statute of limitations is to ensure fairness to defendants by notifying defendants of the claims they must defend before they grow stale."  Baden-Winterwood, 484 F.2d at 828-29 (citing Am. Pip and Construction v. Utah, 414 U.S. 538, 561 (1974)).  Here, giving future opt-ins the full benefit of their claims would cause no prejudice to Defendants.  Defendants undoubtedly had notice of the full scope of their potential liability when Plaintiffs filed their Complaint on behalf of themselves and all other similarly situated workers nationwide.  Indeed, for years Defendants have enjoyed the benefit of withholding thousands of dollars of overtime compensation, knowing that their exposure under the FLSA is limited to just three years.  They now seek further unfair benefit from the statute of limitations.

The circumstances in this case warrant equitable tolling.  Accordingly, Plaintiffs request that the Court toll the statute of limitations for individuals who consent to join this case in the future, from at least April 28, 2008, the date Plaintiffs filed their motion for conditional certification and judicial notice.

---

[16]     See Baden-Winterwood, 484 F.2d at 828 ("Plaintiffs lost time in pursuing their rights because both parties' inability to reach an agreement on how to best provide notice to potential plaintiffs."); Adams v. Inter-Con Sec.Sys., Inc., 242 F.R.D. 530, 543 (N.D. Cal. 2007) ("On the one hand, Plaintiffs bear no fault for this delay, having sought the information necessary to notify potential plaintiffs of the pending action."); Camp v. Progressive Corp., 2004 WL 2149079, at *15 n.7 (E.D. La. Sept. 23, 2004) (noting that it is appropriate "to address whether to apply equitable tolling at least during the pendency of the action to the limitation period of any opt-in plaintiffs, who had been prevented by the court's own action from filing their written consents."); Owens v. Bethlehem Mines Corp., 630 F. Supp. 309, 312-13 (S.D. W. Va. 1986) (tolling the statute when "[t]hrough no fault of the Plaintiffs or the Defendant, the motion to certify was not ruled upon until [approximately a year and a half after it came before the court].").

## <u>CONCLUSION</u>

As long as the FLSA has existed, employers have searched for the "magic" plan that gives the appearance of compliance, while at the same time not actually paying overtime compensation.  The "all pay is overtime pay" and "efficiency premium" schemes created by Defendants in this case are two such plans.  The DOL has repeatedly rejected such attempts, and the Court should do the same here.  Because designing a clever scheme to avoid the FLSA's overtime requirements is not, as matter of law, good faith compliance, Plaintiffs respectfully request that the Court grant their motion for summary judgment on their claims that Defendants' piece rate plans violate the overtime requirements of the FLSA, that the violations were willful, and that Plaintiffs are entitled to liquidated damages.  Plaintiffs also request that the Court grant their request for equitable tolling.


Dated: April 10, 2009                           Respectfully Submitted,


                                                NICHOLS KASTER, PLLP

                                                s/Paul Lukas
                                                Donald H. Nichols, MN State Bar No. 78918
                                                (W.D. Tenn. Admitted Generally)
                                                Paul J. Lukas, MN Bar No. 22084X
                                                (W.D. Tenn. Admitted Generally)
                                                Rachhana T. Srey, MN State Bar No. 340133
                                                (W.D. Tenn. Bar Admitted Generally)
                                                Robert L. Schug, MN Bar No. 0387013
                                                (W.D. Tenn. Admitted Generally)
                                                4600 IDS Center, 80 South 8th Street
                                                Minneapolis, MN  55402
                                                Telephone (612) 256-3200
                                                Fax (612) 215-6870

                                                DONATI LAW FIRM, LLP
                                                Donald A. Donati, TN Bar # 8633
                                                William B. Ryan, TN Bar # 20269

1545 Union Avenue
Memphis, TN 38104
Telephone: (90) 278-1004
Fax: (901) 278-3111

THOMAS F. DONALDSON, JR.
Thomas F. Donaldson, Jr., TN Bar # 16062
Attorney at Law
P.O. Box 949
Marin, AR 72364
Telephone: (870) 739-2588

ATTORNEYS FOR PLAINTIFFS

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney hereby certifies that on April 10, 2009 a true and correct copy of the foregoing document was served via electronic means through the Court's ECF System to the attorneys for the Defendants:

Lewis P. Britt III
George (Bill) Singleton
Ford & Harrison, LLP
795 Ridge Lake Blve., Suite 300
Memphis, Tennessee 38120
lbritt@fordharrison.com
bsingleton@fordharrison.com

Benjamin D. Briggs
Matthew R. Almand
Troutman Sanders LLP
600 Peachtree St., Ste. 5200
Atlanta, Georgia 30308
benjamin.briggs@troutmansanders.com

Robert M. Williams, Jr. Esq.
Baker, Donelson, Bearman, Caldwell, & Berkowitz, PC
165 Madison Avenue, Suite 2000
Memphis, Tennessee  38103
rwilliams@bakerdonelson.com

Dated:  April 10, 2009                         s/Robert L. Schug